**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Berkshire Investments LLC, | ) | Case No. 24-11552 |
| | ) | |
| Debtor. | ) | Honorable David D. Cleary |
| | ) | |
| | ) | |
| Berkshire Investments LLC, | ) | Adv. Proc. No. 24-00336 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| X-Metals Acquisition, LLC and | ) | |
| Tramec, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF EMERGENCY MOTION

TO: See attached list

PLEASE TAKE NOTICE that on **October 30, 2024 at 1:00 p.m.**, I will appear before the Honorable David D. Cleary, or any judge sitting in that judge's place, **either** in courtroom 644 of the Evertt McKinley Dirksen United States Courthouse, 219 S. Dearborn Street, Chicago, Illinois 60604 **or** electronically as described below, and present **Berkshire Investment LLC's Emergency Motion for: (I) Immediate Preliminary Injunctive Relief to Enjoin X-Metals Acquisition, LLC from Terminating its Stalking Horse Bid; (II) Immediate Consolidation of the Hearing for Preliminary Injunctive Relief with the Trial on the Merits; and (III) Excusing Page Limit**, a copy of which is attached.

**Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

**To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

**Meeting ID and passcode**. The meeting ID for this hearing is 161 122 6457, and the passcode is Cleary644. The meeting ID and passcode can also be found on the judge's page on the court's web site.

**In addition to other grounds for opposing the motion, you may oppose the motion on the basis that emergency treatment is not appropriate.**

BERKSHIRE INVESTMENTS LLC

By: /s/ Carolina Y. Sales_____
     One of its attorneys

Steven R. Jakubowski (ARDC #6191960)
Carolina Y. Sales (ARDC #6287277)
Julia Jensen Smolka (ARDC #6272466)
ROBBINS DIMONTE, LTD.
180 N. LaSalle St., Suite 330
Chicago, IL 60601
Office: 312-782-900
Fax: 312-782-6690
sjakubowski@robbinsdimonte.com
csales@robbinsdimonte.com
jsmolka@robbinsdimonte.com

## CERTIFICATE OF SERVICE

I, Carolina Y. Sales, an attorney, certify that I served a copy of this notice and the attached motion on each entity shown on the attached list at the address shown and by the method shown on October 30, 2024 before 10:30 a.m.

/s/ Carolina Y. Sales_____

## SERVICE LIST

## Via ECF

Brian A. Audette on behalf of Interested Party X-Metal Acquisition, LLC and Tramec, LLC
baudette@perkinscoie.com, docketchi@perkinscoie.com;
brian-audette-perkins-coie-8180@ecf.pacerpro.com

William J Factor on behalf of Other Prof. NELI International Incorporated
wfactor@wfactorlaw.com,
wfactorlaw@gmail.com;bsass@wfactorlaw.com;wfactor@ecf.courtdrive.com;wfactormyecfmail
@gmail.com;factorwr43923@notify.bestcase.com

Patrick S Layng
USTPRegion11.ES.ECF@usdoj.gov

Stephen A Yokich on behalf of Creditor United Steelworkers
efile@laboradvocates.com, syokich@laboradvocates.com

Elizabeth L Janczak on behalf of Creditor Committee Official Committee Of Unsecured
Creditors
ejanczak@sgrlaw.com, bkdocketing@sgrlaw.com

John A Lipinsky on behalf of Creditor Paymaker Mechanical, Inc.
lipinsky@ccmlawyer.com, Haskell@ccmlawyer.com;hoekstra@ccmlawyer.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Berkshire Investments LLC, | ) | Case No. 24-11552 |
| | ) | |
| Debtor. | ) | Honorable David D. Cleary |
| | ) | |
| | ) | |
| Berkshire Investments LLC, | ) | Adv. Proc. No. 24-00336 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| X-Metals Acquisition, LLC and | ) | |
| Tramec, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEBTOR'S EMERGENCY MOTION FOR: (I) IMMEDIATE PRELIMINARY
INJUNCTIVE RELIEF TO ENJOIN X-METALS ACQUISITION,
LLC FROM TERMINATING ITS STALKING HORSE BID;
(II) IMMEDIATE CONSOLIDATION OF THE HEARING FOR
PRELIMINARY INJUNCTIVE RELIEF WITH THE TRIAL ON THE MERITS;
AND (III) EXCUSING PAGE LIMIT**

Berkshire Investments LLC ("Berkshire" or the "Debtor"), debtor and debtor in possession, by and through its attorneys, Robbins DiMonte, Ltd., pursuant to Fed. R. Civ. P. 65, made applicable to this proceeding by Fed. R. Bankr. P. 7065, and 11 U.S.C. § 105(a), hereby submits this Emergency Motion for: (I) immediate preliminary injunctive relief against X-Metals Acquisition, LLC ("X-Metals") from terminating its stalking horse bid; (II) immediate consolidation of the hearing for preliminary injunctive relief with the trial on the merits on the underlying complaint requesting an order that X-Metals and Tramec, LLC ("Tramec," and together with X-Metals, the "Acquirors") consummate the purchase of the Debtor's assets under the

Stalking Horse APA (as defined below); and (III) excusing the page limit under the Court's local rules. In support of this Motion, the Debtor states as follows:

## I.    PRELIMINARY STATEMENT

The Debtor filed this chapter 11 case to facilitate the Acquirors' purchase of substantially all the Debtor's assets as a going concern. Eight months before the filing, the Debtor and Tramec executed a letter of intent in which Tramec agreed on a non-binding basis and subject to certain conditions to acquire the Debtor's assets for $4.5 million plus assumption of certain "Assumed Liabilities" (including "trade accounts payable, accrued expenses, and all other current liabilities . . . of [the Debtor's] business") In exchange, the Debtor agreed to be legally bound by a broad "Exclusivity" provision in which it agreed, among other comparably broad prohibited actions, to not "initiate, solicit, seek, or encourage any inquiries or the making of any proposals or offers" for the acquisition of the all or a material portion of its assets.

In late July 2024, Tramec determined that, notwithstanding the terms of the letter of intent, Tramec would only complete the purchase of the Debtor's assets in a sale under Section 363 of the Bankruptcy Code. The Debtor, with the support of its senior secured lender, NELI International Inc. ("NELI"), filed its chapter 11 petition for relief on August 8, 2024, with NELI agreeing to provide working capital financing through a post-petition credit facility of up to $3.5 million, subject to an approved budget model prepared by the Executive Vice President / Chief Financial Officer of the Acquirors. A condition to initial funding of that post-petition credit facility was that the Debtor and X-Metals execute the Stalking Horse APA (defined below).

That purchase agreement, however, was not executed for another two weeks, meaning that the Debtor had no access to working capital financing during the first 19 days following the Petition Date. The Acquirors knew in advance of executing the Stalking Horse APA that the projected sales forecast for the first two weeks following the Petition Date was significantly

overstated compared to actual results. They also knew that future post-petition sales during the budget period would fall significantly below amounts forecasted by the Acquirors in the approved budgets attached to this Court's second interim and final orders approving the post-petition credit facility, both of which were entered after the signing of the Stalking Horse APA. But when the Debtor suggested to Acquirors that the budget forecast should be revised to reflect the residual effect of the Debtor's significant underperformance in the first three weeks following the Petition Date, the Acquirors declined to do so as being unnecessary, saying "just leave it as it is."

In the Post-Petition Credit Facility (defined below), the Debtor covenanted that it would provide NELI with variance reports comparing actual to forecasted post-petition performance on a weekly and four-week rolling weekly basis. Following transmittal of each such variance report, the Acquirors' Chief Executive Officer and Executive Vice President / Chief Financial Officer, along with principals of NELI and the Debtor, would have a conference call lasting about 30 minutes each to review the information contained in that report. Despite the Debtor's significant continuing financial underperformance in each weekly report compared to the approved budget, the Chief Executive Officer and Executive Vice President / Chief Financial Officer of the Acquirors repeatedly assured both NELI and the Debtor that these financial results would not deter the Acquirors from closing on the Stalking Horse APA if the stalking horse bid were to prevail at the scheduled auction.

The Stalking Horse APA was the only bid received by the Debtor as of October 22, 2024, the date of the scheduled auction. Counsel for the Acquirors attended and voiced no objection to the declaration of the Debtor's counsel that the Stalking Horse APA (as modified by agreed-upon technical amendments at the auction) was the winning bid. Three days after the auction, however, the Acquirors' counsel sent a letter advising that it was terminating the Stalking Horse APA

3

because "at least one Material Adverse Effect had occurred" under the agreement. Counsel, however, never identified exactly what the supposed "Material Adverse Effect" (as defined in the Stalking Horse APA) was.

Counsel for the Debtor and NELI sharply responded to the Acquirors' attempt to rescind its prevailing bid, with the Debtor's counsel writing:

> [T]o the extent X-Metals is arguing that the Debtor's post-petition performance was below budget projections, that shortfall was predicted by and known to X-Metals' principals before the ink on them was dry. What mattered, everyone agreed, was getting to closing, consistent with the milestones approved by the Court in the Sale Procedures Order."
>
> However, as noted in a response letter by Metals attempted to terminate the Asset Purchase Agreement based on the alleged existence of a "Material Adverse Effect." However, no such Material Adverse Effect existed to support X-Metals' decision. The definition of Material Adverse Effect in page 3 of the asset purchase agreement explicitly excludes "changes resulting from the Chapter 11 Case." Any alleged Material Adverse Effect was a change directly resulting from the bankruptcy case. X-Metals' abrupt termination will force Berkshire to cease operations and liquidate its assets, resulting in the loss of 73 full-time employees and a substantial deficiency under the NELI obligations. Berkshire hereby seeks immediate relief under Section 12.12 of the APA, which entitles Berkshire to specific performance if X-Metals breaches or refuses to perform.

Echoing the comments of Debtor's counsel, NELI's counsel responded even more harshly, writing:

> You also cannot deny that at all relevant times, including currently, Tramec has been aware of the Debtor's operational, management and financial challenges. Such challenges did not deter your client from clearly and repeatedly representing that it intended to capitalize on the Debtor's metal extruding techniques not generally known to the public and based on such trade secrets it intended to turn the business around.
>
> While the Letter proffers a "Material Adverse Effect" as the rationale for not closing, this easily will be seen as a ruse. Your Letter does not identify any specific sudden material change in the

> Debtor's financial condition, assets or business to support the
> eleventh-hour decision; a decision made just days after appearing at
> the auction to confirm Tramec's winning bid. Tramec's actions also
> chilled the bidding for the Debtor's assets and left the Debtor with
> no viable path forward other than a complete shut-down and
> liquidation. This will result in the layoff of almost 100 employees
> just before the holidays as well as a substantial deficiency under the
> NELI obligations.

The Debtor will be irreparably harmed if the Acquirors' attempted termination of the Stalking Horse APA is permitted to stand. Section 11.04 of the Stalking Horse APA, the Debtor's exclusive remedy for breach by the Acquirors is specific performance under Section 12.12 thereof. This section provides:

> **Specific Performance**. The parties recognize that if the Buyer
> breaches this Agreement or refuses to perform under the provisions
> of this Agreement, monetary damages alone would not be adequate
> to compensate Seller for its injuries. Seller shall therefore be
> entitled, in addition to any other remedies that may be available, to
> equitable relief, including an injunction or injunctions or orders for
> specific performance, to prevent breaches or threatened breaches of
> this Agreement and to enforce specifically the terms and provisions
> of this Agreement (including, for the avoidance of doubt, the
> obligation of the Buyer to consummate the transactions
> contemplated by this Agreement), without proof of actual damages
> or the posting of a bond or other undertaking. If any action is brought
> by Seller to enforce this Agreement, the Buyer shall waive the
> defense that there is an adequate remedy at Law.

An order of immediate preliminary injunctive relief, therefore, is appropriate to enjoin the Acquirors' attempted termination of the Stalking Horse APA. In addition, immediate permanent injunctive relief ordering the Acquirors to consummate the purchase of the Debtor's assets under the Stalking Horse APA is also appropriate. Absent such immediate relief, NELI will terminate the Post-Petition Credit Facility, thereby resulting in a shutdown of the Debtor's operations and the termination of 49 full-time union employees and 23 full-time salaried employees. Perhaps this will please the three members of the Creditors' Committee who operate scrap metal businesses and who have been advocating for a shutdown of the Debtor's operations since the Committee was

organized, but it will exact a great human, financial, and social toll on hundreds of employees and their families, not to mention customers, post-petition vendors, and others who have been doing business with the Debtor for years, if not decades.

Further, denying the Emergency Motion threatens the sanctity of the Section 363 sale process generally, which will necessarily be severely tarnished if potential acquisition parties like Tramec and X-Metals are permitted, without consequence, to profess to a debtor and the senior secured post-petition lender that financial underperformance by the debtor is not material to its stalking horse bid, and then to terminate its bid (after it has been declared the winning bidder at auction and only a few days before the scheduled court hearing to approve that sale) on the basis that the debtor's financial underperformance was a "material adverse event" that entitles it to terminate its obligation under the purchase agreement.

## II.   JURISDICTION, VENUE, AND PARTIES

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois, as the action is related to this case commenced under Chapter 11 of Title 11 of the United States Code.

2.      This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

3.      Venue in this District is proper pursuant to 28 U.S.C. § 1409.

4.      Berkshire is the debtor in possession in its chapter 11 bankruptcy case.

5.      Tramec, LLC is a Delaware limited liability company.

6.      X-Metals is a Delaware limited liability shell company formed by Tramec on June 28, 2024 as Tramec's instrumentality for the exclusive purpose of entering into the Stalking Horse APA (as defined below) with the Debtor for the acquisition of substantially all the assets of the

Debtor. X-Metals has no assets, no bank accounts, shares the same executive officers and offices as Tramec, and all decisions regarding X-Metals, including whether to close on the Stalking Horse Asset Purchase Agreement (as defined below), are made exclusively by the Board of Directors of Tramec.

### III.   STATEMENT OF FACTS

#### A.   BACKGROUND

7.      The Debtor currently produces standard and engineered brass and bronze alloys in extruded rod, bar, and other profiles, including a variety of low lead brass, leaded brass, naval brass, aluminum bronze, and silicon bronze alloys.

8.      The Debtor's predecessor filed for bankruptcy in 2003 when margins were small, competitors were many, and working capital was insufficient to sustain operations.

9.      The Debtor currently produces standard and engineered brass and bronze alloys in extruded rod, bar, and other profiles, including a variety of low lead brass, leaded brass, naval brass, aluminum bronze, and silicon bronze alloys.

10.     On August 8, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 case (the "Case").

11.     Since the Petition Date, the Debtor has remained in possession of its assets and continued to operate its business as a debtor in possession in accordance with Sections 1107(a) and 1108 of the Bankruptcy Code. On August 23, 2024, the official committee of unsecured creditors (the "Committee") was appointed [Bankr. ECF No. 24].

#### B.   The Post-Petition Credit Facility

12.     On August 12, 2024, the Debtor filed an *Emergency Motion for Order: (I) Authorizing (A) Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C.*

*§ 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (C) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(C); and (III) Shortened and Limited Notice Thereof* (the "DIP/Cash Collateral Motion") [Bankr. ECF No. 12].

13.     Under the DIP/Cash Collateral Motion, the Debtor sought, among other things: (a) approval of the Post-Petition Credit Facility with NELI and (b) use of cash collateral that secured NELI's prepetition senior secured claims ("Cash Collateral").

14.     Attached as Exhibit B to the DIP/Cash Collateral Motion was a "DIP Financing Forecast" (the "Original DIP Budget Forecast").

15.     The Original DIP Budget Forecast was prepared by Tramec's Executive Vice President / Chief Financial Officer and circulated for review and comment by the Debtor and NELI.

16.     On August 14, 2024, the Court granted the DIP/Cash Collateral Motion on an interim basis and scheduled a final hearing thereon for September 4, 2024 [Bankr. ECF No. 22].

17.     A condition to initial funding of the Post-Petition Credit Facility, however, was that the Debtor and X-Metals execute the Stalking Horse APA described below.

## C.     The Stalking Horse Bid

18.     On August 21, 2024, the Debtor and X-Metals entered into an Asset Purchase Agreement pursuant to which X-Metals agreed to acquire substantially all of the assets of the Debtor (the "Stalking Horse APA"), subject to the terms thereof. A copy of the fully executed Stalking Horse APA, including exhibits, was filed with the Court as Docket Nos. 26 and 27.

19.     The Stalking Horse APA contained a number of definitions, including one for "Material Adverse Effect," which was defined as follows:

"**Material Adverse Effect**" means a material adverse effect on the Business, assets or financial condition of the Purchased Assets and Assumed Liabilities, taken as a whole, excluding any such effect to the extent resulting from or arising in connection with (i) the transactions contemplated hereby or the announcement thereof, (ii) changes or conditions affecting the industries generally in which Seller operates, (iii) changes in economic, regulatory or political conditions generally, or (iv) changes resulting from the Chapter 11 Case; provided, however, in the case of subsections (ii) and (iii), such changes or conditions may be taken into account in determining whether there has been or is a Material Adverse Effect to the extent such changes have a disproportionate effect on the Purchased Assets and Assumed Liabilities relative to other businesses operating in the industry in which the Business operates; provided, further, however, in the case of subsection (iv), such changes or conditions may be taken into account in determining whether there has been or is a Material Adverse Effect in the case it would be an expansion of the Assumed Liabilities or an increase in the Purchase Price beyond the Cap on the Purchase Price. Without any express or implied limitation of the generality of the foregoing, the following shall constitute a "Material Adverse Effect": (A) Seller's furnaces and extrusion lines have ceased operating consistent with normal pre-Petition operations, other than for routine or ordinary course maintenance, (B) a strike, work stoppage, or renegotiation of or dispute under the Union Contract, and (C) any adversary or other Proceeding that is initiated or threatened that could be reasonably likely to result in a material increase in or expand the scope of the Assumed Liabilities.

20.     Under Section 9.02(e) of the Stalking Horse APA, the obligation of X-Metals to close was conditioned upon there ""having been no Material Adverse Effect."

**D.      The Debtor's Financial Results Significantly Underperformed the Budgeted Forecasts.**

21.     As a result of the Acquirors' delays in obtaining approval by the Tramec Board of Directors of the Stalking Horse APA until August 21, 2024, the Debtor had no access to working capital financing under the Post-Petition Credit Facility during the first 19 days following the Petition Date.

22.     The Acquirors knew in advance of executing the Stalking Horse APA that the projected sales forecast for the first two weeks following the Petition Date was significantly overstated compared to actual results.

23.     The Acquirors also knew in advance of executing the Stalking Horse APA that future sales revenues during the post-petition period would fall significantly below forecasted amounts.

24.     On September 12, 2024, the Court entered a final order on the DIP/Cash Collateral Motion (the "Final DIP Order") [Bankr. ECF No. 61]. The budget setting forth by line item all projected cash receipts and cash disbursements for the time period from the Petition Date through November 4, 2024 (the "Amended DIP Budget Forecast") was attached to the Final DIP Order as Exhibit A.

25.     The only changes made to the Amended DIP Budget Forecast from the Original DIP Budget Forecast were to reflect the actual post-petition financial performance during the first three weeks following the Petition Date and to adjust certain extraordinary expense items related to the chapter 11 case, such as projected interim compensation payments due professionals for the Debtor and the Committee.

26.     When the Debtor suggested to the Acquirors that the budget forecast be revised to reflect the residual effect of the Debtor's significant underperformance in the first three weeks following the Petition Date, the Acquirors declined to do so as unnecessary, saying "just leave it as it is."

27.     In the Post-Petition Credit Facility, the Debtor covenanted that it would provide NELI with variance reports comparing actual to forecasted post-petition performance on a weekly and four-week rolling weekly basis (the "Weekly Variance Reports").

28. Following transmittal of a Weekly Variance Report, the Chief Executive Officer and Executive Vice President / Chief Financial Officer of the Acquirors, along with principals of NELI and the Debtor, would have a conference call lasting about 30 minutes each to review the information contained in that Weekly Variance Report.

29. Despite the Debtor's significant continuing financial underperformance each week following entry of the Final DIP Order compared to the Amended Approved DIP Budget, the Chief Executive Officer and Executive Vice President / Chief Financial Officer of the Acquirors, repeatedly assured both NELI and the Debtor that this would not dissuade the Acquirors from closing on the Stalking Horse APA if the stalking horse bid were to prevail.

**E.** **The Stalking Horse Bid Is Designated the Prevailing Bid at the Auction.**

30. On August 23, 2024, pursuant to 11 U.S.C. §§ 363 and 365, the Debtor filed a *Motion (I) for an Order (A) Approving Sale Process And Stalking Horse Asset Purchase Agreement; (B) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Approving Form of Notices; (D) Excusing Page Limit; and (E) Scheduling a Public Auction and Sale Approval Hearing; and (II) for an Order: (A) Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* (the "Sale Procedures Motion" [Bankr. ECF No. 33].

31. The Sale Procedures Order established procedures for the sale (the "Asset Sale") of all, or substantially all, or a portion of the Debtor's assets (the "Sale Assets"), including a stalking horse asset purchase agreement with a break-up fee, expense reimbursement, and an initial overbid amount, together with a form asset purchase for non-stalking-horse bidders.

32.     Paragraph 11 of the Sale Procedures Order set October 22, 2024 as the date of the auction (the "Auction") for the Sale Assets.

33.     The Auction took place at the office of the Debtor's counsel and via Zoom.

34.     Counsel for the Debtor; NELI; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local 7-00717 (the "Union"); the Committee; and the Acquirors attended the Auction via Zoom.

35.     Prior to the Auction, no competing bids were submitted, leaving the Stalking Horse Bid as the only bidder for the Sale Assets.

36.     At the Auction, the Acquirors agreed to certain technical changes to its Stalking Horse Bid to: conform the sale milestones and break-up fee allowance, consistent with the terms of the Sale Procedures Order; correct the scheduled cure amounts due the Union under the Collective Bargaining Agreement; and clarify that the consideration to be paid directly for the benefit of the Debtor's estate would be $100,000, not "up to $100,000" as originally provided in the Stalking Horse APA.

37.     The Acquirors' counsel confirmed the revisions to the Stalking Horse Bid and stated on the record that these technical changes to the Stalking Horse Bid were acceptable to the Acquirors, whereupon the Debtor's counsel declared the Stalking Horse Bid, to be the prevailing bid (the "Prevailing Bid").

38.     Counsel for the Acquirors voiced no objection to the Debtor's declaration of the Prevailing Bid.

39.     At no time between the execution of the Stalking Horse APA or the declaration of Stalking Horse Bid as the Prevailing Bid did the Acquirors suggest to the Debtor or NELI that a "Material Adverse Effect" within the meaning of the Stalking Horse APA had occurred.

40.     On the morning after the close of the Auction proceeding, October 23, 2024, counsel for the Acquirors delivered a revised Asset Purchase Agreement to the Debtor's counsel which contained the conforming technical changes agreed to by the Acquirors' counsel at the Auction (the "First Amended and Restated Asset Purchase Agreement"), only adding that the draft was "subject to final review and approval" by the Acquirors. Counsel for the Acquirors requested in the email accompanying the draft that the Debtor's counsel "assemble and add the exhibits/schedules."

41.     Later that day of October 23, 2024, the Debtor's counsel delivered an "Execution Final" version of First Amended and Restated Asset Purchase Agreement to counsel for the Acquirors, including the requested updated exhibits and schedules.

42.     On October 25, 2024, counsel for the Acquirors delivered a letter to the Debtor, claiming to terminate the Stalking Horse APA (the "Acquirors' Termination Letter"). The letter stated that the termination was permitted under the Stalking Horse APA because "at least one" Material Adverse Effect had occurred. The letter, however, failed to identify exactly what that "Material Adverse Effect" was that justified such termination, stating only:

> Regrettably, at least one Material Adverse Effect has occurred due to, among other things, "a material adverse effect on the Business, assets [and] financial condition of the Purchased Assets and Assumed Liabilities, taken as a whole . . ." *See* APA, § 9.02(e). In light of such Material Adverse Effect, X-Metals is not obligated to close on the sale contemplated by the APA. *Id*. Consequently, formal notice is hereby given that X-Metals has elected to terminate the APA immediately pursuant to Section 11.01 of the APA. X-Metals reserves all other rights and remedies under and in connection with the APA.

43.     On October 27, 2024, the Debtor's counsel sent a response to the Acquirors' counsel, demanding that the Acquirors close on the First Amended and Restated Asset Purchase Agreement (the "Berkshire Demand Letter").

44.    On October 28, 2024, NELI's counsel sent its own response to the Acquirors' counsel's assertion of a "Material Adverse Effect" and requested X-Metals to "promptly reconsider its decision, rescind the [Termination] Letter, and consummate the sale with the Debtor under the terms of the APA" (the "NELI Demand Letter"), adding the following strongly worded, highly critical commentary regarding the Acquirors' change of heart and apparent bad faith:

> It goes without saying that the Letter is shocking to NELI and, as witnessed by Steve Jakubowski's letter dated October 27, to the Debtor. As discussed below, an objective onlooker easily could find that Tramec has been engaging in bad faith and perhaps even fraudulent conduct if it implements the actions identified in the Letter.

> I don't believe I need to recite to you what transpired between the Debtor, [the Acquirors] and NELI over the last year. Since Tramec announced a strong interest in acquiring the Debtor as a going concern, NELI and its representatives have been supportive of this effort. It provided working capital and other financial accommodations to facilitate the anticipated transaction, all in reliance on Tramec's representations that it was earnestly desirous of acquiring the Debtor's business. Among other things, NELI advanced working capital to the Debtor above NELI's lending formulas and dedicated valuable time and energy. NELI also incurred hundreds of thousands of dollars in expenses to assist in the process.

> You also cannot deny that at all relevant times, including currently, Tramec has been aware of the Debtor's operational, management and financial challenges. Such challenges did not deter your client from clearly and repeatedly representing that it intended to capitalize on the Debtor's metal extruding techniques not generally known to the public and based on such trade secrets it intended to turn the business around.

> While the Letter proffers a "Material Adverse Effect" as the rationale for not closing, this easily will be seen as a ruse. Your Letter does not identify any specific sudden material change in the Debtor's financial condition, assets or business to support the eleventh-hour decision; a decision made just days after appearing at the auction to confirm Tramec's winning bid. Tramec's actions also chilled the bidding for the Debtor's assets and left the Debtor with no viable path forward other than a complete shut-down and liquidation. This will result in the layoff of almost 100 employees

14

just before the holidays as well as a substantial deficiency under the NELI obligations.

The foregoing is but a snapshot of the facts that make NELI concerned that Tramec has been engaged in a scheme to defraud involving numerous materially false representations related to its intent to acquire the Debtor's assets. If necessary, further discovery will be pursued to learn if Tramec's scheme, including the part that mislead NELI, was perpetuated to obtain unfettered access to the Debtor's books, records and operations, including trade secrets consisting of certain extruded metal techniques.

**F.**     **The Debtor's Specific Performance Rights Under the Stalking Horse APA.**

45.     Section 12.12 of the Stalking Horse APA (as agreed to be amended at the Auction)

states as follows:

> **Specific Performance**. The parties recognize that if the Buyer breaches this Agreement or refuses to perform under the provisions of this Agreement, monetary damages alone would not be adequate to compensate Seller for its injuries. Seller shall therefore be entitled, in addition to any other remedies that may be available, to equitable relief, including an injunction or injunctions or orders for specific performance, to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including, for the avoidance of doubt, the obligation of the Buyer to consummate the transactions contemplated by this Agreement), without proof of actual damages or the posting of a bond or other undertaking. If any action is brought by Seller to enforce this Agreement, the Buyer shall waive the defense that there is an adequate remedy at Law.

46.     As described in the Acquirors' Termination Letter, the Acquirors are refusing to fulfill their obligations to close under the Stalking Horse APA (as agreed to be amended at the Auction). The Debtor, however, is ready, willing, and able to fulfill its obligations under the terms of the Stalking Horse APA (as agreed to be amended at the Auction) and has performed all of the conditions required to be performed by it thereunder (except those that the Acquirors' actions prevented it from performing).

47.     The Acquirors' refusal to perform under the Stalking Horse APA constitutes a material breach of the agreement. The only reason given by the Acquirors for attempting to terminate the agreement is that a "Material Adverse Event" has occurred (as defined therein).

48.     In fact, there has been no such "Material Adverse Effect" justifying termination of the agreement. The Acquirors knew that the Debtor's post-petition financial performance would significantly underperform the budgets that the Acquirors themselves had developed for the business. Indeed the Chief Executive Officer and Executive Vice President / Chief Financial Officer of the Acquirors advised the Debtor's principals that it was not necessary to amend the approved budgets to the Post-Petition Credit Facility despite the Debtor's inability to draw down funds under that facility for the first 19 days and to just leave them "as it is."

49.     The Debtor is being irreparably harmed by reason of the Acquirors' attempted termination of the Stalking Horse APA (as agreed to be amended at the Auction) since under Section 11.04, the Debtor's exclusive remedy for breach of the Stalking Horse APA is specific performance under Section 12.12 thereof.

50.     If the Acquirors are not immediately compelled to timely close on the contemplated acquisition, NELI will terminate the Post-Petition Credit Facility, the Debtor will have no funds to continue operating, and the 73 current full-time employees whom the Acquirors agreed to hire post-closing, many of whom have been employed by the Debtor for decades, will have to be laid off with no prospect of being rehired.

## IV.   ARGUMENT

51.     Pursuant to Fed. R. Civ. P. 65, made applicable to this proceeding by Fed. R. Bankr. P. 7065, the Court may issue a preliminary injunction. *In re Gander Partners LLC*, 432 B.R. 781, 789 (Bankr. N.D. Ill. 2010) (citing to Fed. R. Bankr. P. 7065(c) as basis for authority to issue

preliminary injunction or restraining order). Fed. R. Civ. P. 65(a)(2) also states that the Court "may

advance the trial on the merits and consolidate it with the hearing."

52.     The Court's authority to grant preliminary and permanent injunctive relief is further

separately and independently authorized under Bankruptcy Code section 105(a), 11 U.S.C.

§ 105(a). As stated by the Seventh Circuit in *In re L&S Industries, Inc.*, 989 F.2d 929 (7th Cir.

1993):

> In determining whether to grant a preliminary injunction, a district
> court typically considers whether the moving party (1) has an
> adequate remedy at law, (2) will suffer irreparable harm if the
> injunction is not issued, and (3) has some likelihood of success on
> the merits. [. . .] However, in order to issue a preliminary injunction,
> a court sitting in bankruptcy need not meet all three requirements
> outlined above. The Bankruptcy Act provides the court with broad
> equitable powers to preserve its own jurisdiction: "The court may
> issue any order, process, or judgment that is necessary or appropriate
> to carry out the provisions of this title." 11 U.S.C. § 105(a).

*Id*. at 932.

53.     Exercise of the Court's injunctive powers under Bankruptcy Code section 105(a) is

appropriate here. Maintaining the integrity of the Section 363 sale process is of paramount

importance and the sterling reputation of this Court nationwide will be severely tarnished if

potential acquisition parties like Tramec and X-Metals are permitted, without consequence, to

profess that a debtor's financial underperformance is not material to its stalking horse bid, but then

later assert that a "material adverse effect" occurred based on that financial underperformance,

thereby giving it the right to unilaterally terminate its bid even after it has been declared the

winning bidder at auction just days before the scheduled court hearing to approve the winning bid.

54.     The public interest is further served by ensuring that stalking horse bidders in

bankruptcy cases are denied the right to rescind their offers without valid justification. *Cf. In re

1600 Hicks Road LLC*, 649 B.R. at 183 ("Successful reorganizations are in the public interest.");

*In re Spiers Graff Spiers*, 190 B.R. 1001, 1012 (Bankr. N.D. Ill. 1996) ("The public interest served by issuing injunctions in Chapter 11 cases is the promotion of successful reorganizations.").

55.     The Motion should also be granted because the Debtor does not have an adequate remedy at law. Whether the moving party has an adequate remedy at law is determined by "whether the [moving party] will be made whole if [it] prevails on the merits and is awarded damages." *Somerset Place, LLC v. Sebelius*, 684 F. Supp. 2d 1037, 1042 (N.D. Ill. 2010) (quoting *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)).

56.     Regardless, here the Acquirors expressly agreed in Section 12.12 of the Stalking Horse APA, in consideration of the Debtor's agreement in Section 11.04 to not assert a right to monetary damages in the event of a breach, that the Debtor would be entitled to obtain injunctive relief and an order for specific performance to prevent unjustified breaches or threatened breaches of the Stalking Horse APA and to compel the Acquirors to close on the acquisition.

57.     The Debtor and other parties in interest also will suffer irreparable harm if the injunction is not issued. "An injury is 'irreparable' when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard." *Somerset Place, LLC*, 684 F. Supp. 2d at 1042. If the Acquirors are not immediately compelled to timely close on the contemplated acquisition, NELI will terminate the Post-Petition Credit Facility and the Debtor will have be forced to cease operations, resulting in the 73 full-time employees whom the Acquirors agreed to hire post-closing to be laid off with no prospect of being rehired or finding comparable employment anywhere in the Chicagoland area.

58.     The Court should also issue the preliminary and permanent injunction of specific performance because, as a matter of law, no "Material Adverse Effect" exists that warrants termination of the Stalking Horse. As noted by the court in *In re Lyondell Chem. Co.*, 567 B.R.

55, 123 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018), that whether a material adverse change occurred depended on "whether the alleged material adverse change was within the contemplation of the parties at the time they executed the agreement." *See also Luxco, Inc. v. Jim Beam Brands, Co.*, No. 14 C 0349, 2014 WL 4477560, at *5 (N.D. Ill. Sept. 11, 2014) ("[M]aterial adverse effects" are those that "substantially threaten the overall earnings potential of the target in a durationally significant manner" and [. . .] "short term hiccups" do not constitute material adverse effects.).

59.     The uncontrovertible evidence that will be presented to the Court is that the Debtor's financial underperformance was caused by (i) a lack of working capital during the first 19 days of the case from which it could never recover and (ii) the agreement of the Acquirors' that it was unnecessary to modify the approved post-petition budgets to reflect the reality and impact of the Debtor's inability to access the Post-Petition Credit Facility early in the case. Rather, as noted above, the Acquirors' Chief Executive Officer and Executive Vice President / Chief Financial Officer advised, just leave the forecast "as it is."

60.     Further, as the Debtor's counsel stated in the Berkshire Demand Letter, to the extent X-Metals is arguing that the Debtor's post-petition performance was below budget projections, that shortfall was predicted by and known to the Acquirors' principals before the ink on them was dry. Rather, what everyone agreed mattered was getting to closing, consistent with the milestones approved by the Court in the Sale Procedures Order.

61.     Pursuant to Fed. R. Bankr. P. 7065, the Debtor is not required to post a bond in order to obtain a preliminary injunction. *See In re Caesars Entertainment Operating Co., Inc.*, 561 B.R. 441, 457 (explaining that no bond will be required when respondents were unable to show that a preliminary injunction will damage them in any way). Regardless, Section 12.12 of the

Stalking Horse APA provides that injunctive relief against the Acquirors may be granted "without proof of actual damages or the posting of a bond or other undertaking."

62.     Finally, the balance of equities also favors granting the Motion. The primary reason for the filing of the Debtor's chapter 11 case was to accommodate the Acquirors' desire to purchase the assets in a "free and clear" sale under Bankruptcy Code section 363. NELI continued to extend substantial credit despite the Debtor's significant underperformance compared to budget (including allowing for an uncapped carve-out for retained professionals of the Debtor and the Committee) in reliance on the Acquirors' unconditional commitment each week to close on the Stalking Horse APA despite substantial weekly budget variances, each of which gave NELI the right to declare a default and terminate the Post-Petition Credit Facility.

63.     So, too, does the balance of equities favor the Debtor's 49 full-time union employees and 23 full-time salaried employees, who remained loyal to the Debtor despite the obvious working capital shortfalls (and occasional late funding of payroll). For good reason they believed the Chief Executive Officer and Executive Vice President / Chief Financial Officer of the Acquirors, who were consistently present at the Debtor's facility and had committed in the Stalking Horse APA to hire all of the Debtor's full-time employees.

64.     In sum, a dire situation now faces the Debtor, its employees, its senior secured lender, its customers, and the post-petition vendors owed over $250,000 in the aggregate. Absent immediate preliminary and permanent injunctive relief in the coming days, NELI will declare a default, the Post-Petition Credit Facility will terminate, the automatic stay will be lifted, the Debtor's operations quickly wound down, and the scrap metal dealers and liquidators circling around this case will have a field day watching the facility be stripped bare of its equipment, all at significant profit to themselves.

65.     Meanwhile, justice will be denied. Respect for the fairness and trustworthiness of the 363 sales process in this district will be diminished. More importantly, 72 full-time union and salaried employees will unemployed ahead of the holidays.

66.     In sum, the Debtor has satisfied all the requirements entitling it to a grant of preliminary and permanent injunctive relief: a clearly ascertainable right that needs protection; the assured irreparable injury that will be suffered by the Debtor and many other interested parties absent the injunction and order of specific performance; the absence of an adequate remedy at law; the express right of the Debtor to specific performance under Section 12.12 of the Stalking Horse APA; and the moral and legal clarity of its position on the merits.

## V.    <u>CONCLUSION</u>

For the reasons stated herein and to be advanced through live testimony and argument, the Court should advance the trial for permanent injunctive relief and specific performance and consolidate it with the hearing on motion for a preliminary injunction and grant the following relief:

A.    Find that:

    (1)    The Debtor's Complaint against the Acquirors for specific performance states a cause of action which, if proven, would entitle the Debtor to relief;

    (2)    The unrestrained actions of the Acquirors in terminating the Stalking Horse APA as complained of in the Debtor's Complaint, if proven, would cause continuing and irreparable injury to the Debtor;

    (3)    Absent injunctive relief, there is no other adequate remedy at law or in equity available to the Debtor; and

    (4)    There is no just reason to require the Debtor to post a bond and no bond will be required to be posted by the Debtor.

B.    Enter an Order preliminarily restraining the Acquirors as follows:

    (1)    Enjoining the Acquirors from terminating the Stalking Horse APA (as agreed to be amended at the Auction); and

21

(2)   Enjoining the Acquirors, or anyone else acting on their behalf, from taking any further action that adversely affects the Debtor's interests under the Stalking Horse APA (as agreed to be amended at the Auction).

C.   Enter an Order permanently enjoining the Acquirors and ordering the Acquirors to immediately close on the Stalking Horse APA (as agreed to be amended at the Auction);

D.   Enter an Order excusing the 15-page limit for this Motion; and

E.   Grant such other and further relief as the Court deems just and equitable under the circumstances.

Dated: October 30, 2024                    Respectfully Submitted,

                                          BERKSHIRE INVESTMENTS, LLC


                                          By: /s/ Steven R. Jakubowski
                                                One of Its Attorneys


Steven R. Jakubowski (ARDC #6191960)
Carolina Y. Sales (ARDC #6287277)
ROBBINS DIMONTE, LTD.
180 N. LaSalle Street, Suite 3300
Chicago, Illinois 60601
Tel: 312-782-9000
sjakubowski@robbinsdimonte.com
csales@robbinsdimonte.com

*Counsel for the Plaintiff*